FILED 11 JUL 12 11:06USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

OREGON NATURAL DESERT ASSOCIATION;            Civil No. 10-1212-CL
and KLAMATH SISKIYOU WILDLANDS
CENTER,                                        ORDER AND
                                               REPORT AND RECOMMENDATION
                    Plaintiffs,

          v.

DAVID SABO, District Ranger, Chemult
Ranger District, Fremont-Winema National
Forests; and U. S. FOREST SERVICE,

               Defendants,

CLARKE, Magistrate Judge.

          In this action, plaintiffs Oregon Natural Desert Association and Klamath Siskiyou Wildlands

Center challenge annual operating instructions issued by defendants District Ranger Sabo and the

Forest Service to graze livestock on the Chemult portion of the Antelope Allotment (Allotment) of

the Fremont-Winema National Forest in the years 2008 through 2010, including the authorization in

2010 to graze Round Meadow within the Allotment. Plaintiffs allege that these grazing

authorizations have caused harm to numerous sensitive plant and animal species and their habitat on

the Antelope grazing Allotment (Allotment) in violation of the National Forest Management Act

1  - ORDER AND REPORT AND RECOMMENDATION

(NFMA) and the National Environmental Policy Act (NEPA). Plaintiffs seek declaratory and injunctive relief. This court has jurisdiction pursuant to 28 U.S.C. § 1331. Before the court are cross-motions for summary judgment brought by plaintiffs (#18) and defendants (#27). For the reasons explained, plaintiffs' motion for summary judgment should be granted in part and denied in part, and defendants' motion for summary judgment should be granted in part and denied in part.

## BACKGROUND

The Forest Service manages the National Forest System under NFMA, 16 U.S.C. § § 1600 et seq., by first "developing a Land and Resource Management Plan (Forest Plan) for each unit of the National Forest System. The Service then implements the Forest Plan by approving or disapproving site-specific actions. The NFMA and service regulations require that proposed actions be consistent with the Forest Plan. 16 U.S.C. § 1604(i)." Forest Guardians v. U.S. Forest Serv., 329 F.3d 1089, 1092 (9th Cir. 2003); Buckingham v. Sec'y of USDA, 603 F.3d 1073, 1077 (9th Cir. 2010); 36 C.F.R. § 219.10. Under the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1751-1753, the Forest Service is authorized to allow livestock grazing on a "designated area of land available for livestock grazing," called an allotment, within a national forest. 36 C.F.R. Ch. II, Part 222; 36 C.F.R. § 222.1(b)(1). The Forest Service manages livestock grazing on an allotment by issuing a grazing permit; an allotment management plan (AMP); and an annual operating plan (AOP) or instruction (AOI). Or. Natural Desert Ass'n v. U.S. Forest Serv., 465 F.3d 977, 979 (9th Cir. 2006) (ONDA); Buckingham, 603 F.3d at 1077. Each of these are site-specific actions which must be consistent with the Forest Plan. Buckingham, 603 F.3d at 1077; Native Ecosystems Council v. Tidwell, 599 F.3d 926, 934 (9th Cir. 2010). A grazing permit grants a license and establishes the

number, kind, and class of livestock; the allotment to be grazed, and the period of authorized use.

ONDA, 465 F.3d at 980 (citing 36 C.F.R. §§ 222.1 - 222.4; 43 U.S.C. § 1752).  A grazing permit is

ordinarily issued for a term of ten years, and may be canceled, modified, or suspended under certain

conditions.  36 C.F.R. § 222.4; 43 U.S.C. § 1752.  An AMP is

> an allotment-specific planning document that:  (1) prescribes the manner in, and
> extent to which, grazing operations will be conducted in order to meet multiple-use
> and other goals and objectives; (2) describes any range improvements in place or to be
> installed and maintained to meet allotment objectives; and (3) contains any other
> grazing management provisions and objectives prescribed by the Forest Service.

Or. Natural Desert Ass'n v. U.S. Forest Serv., 312 F. Supp.2d 1337, 1340 (D. Or. 2004) (citing 36

C.F.R. § 222.1(b)(2)).  As shown in the record, an AOP or AOI is issued annually prior to the

grazing season and sets out instructions to the permittee for that season's grazing operations.

"Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or

may not have anticipated and planned for in the AMP or grazing permit, such as drought conditions,

timing and duration of rainfall over the grazing season, success or failure of habitat restoration

projects, water quality, or degree of risk to threatened or endangered species affected by grazing."

ONDA, 465 F.3d at 980-81.  The AOP or AOI is an agreement signed by the Forest Service and the

permittee and, as shown in the record, provides that it is made part of the permittee's grazing permit.

    The Land and Resource Management Plan - Winema National Forest dated 1990 (Forest

Plan) is the governing Forest Plan for the Allotment.  (Sept. 2008 AR 12-204.)

    In 1993, U.S. Fish & Wildlife Service determined that listing the Oregon spotted frog as

threatened was warranted because it was "known to be severely declining," making the frog a

"candidate species," but listing was precluded by work on other species with a higher priority. 58 Fed. Reg. 27260 at 27262 (May 7, 1993). (See AR 4442.)

An environmental assessment and accompanying biological evaluation were completed in May 1995 for the purpose of analyzing the effects of continued grazing on the Allotment in the context of renewal of the 1996 grazing permit. (Sept. 2008 AR 399-422, 437-439, 557.)

A population of the Oregon spotted frog was discovered in Jack Creek in the spring of 1996. (Sept. 2008 AR 738, 1960.) It is one of five populations in the Klamath Basin. Oregon spotted frogs sampled from the Klamath Basin populations appear to compose a genetic unit more divergent from other sampled populations. The population of Oregon spotted frog living in the perennial reach of the Jack Creek drainage has been described by Forest Service personnel as "unique" because it is located at the highest elevation recorded for the frog in the Klamath Basin; its isolated population; it lacks exotic aquatic predators; and it is within an active grazing allotment. (Sept. 2008 AR 2337, 2352, 2861.) The Jack Creek Oregon spotted frog population has steadily declined. (Sept. 2008 AR 1959, 2337, 2353, 2540, 2899, 3824, 3825; AR 2511, 2512, 2944, 4442.) The highest breeding populations of the Oregon spotted frog have been found within the heavily grazed private land portions of Jack Creek. (AR 2706, 3933; see AR 2270.)

In 1998, Round Meadow, an approximately 300-acre meadow, was acquired by the Winema National Forest through a land exchange. The Final Environmental Impact Statement (FEIS) was prepared for the exchange. (AR 762, 729-1151, 1837.)

Records indicate that Round Meadow was grazed in 2002. (Sept. 2008 AR 1461, 1675-1676.)

A decision memo for the Round Meadow rehabilitation project was signed in September 2003. The goals for the project were to restore wetland wildlife habitat, restore the natural water storage and release characteristics of the meadow, increase the abundance and extent of wetland vegetation, and reduce encroachment of lodgepole pines. Because Round Meadow is within the boundary of the Allotment, "A perimeter fence will control grazing in the meadow during recovery." The memo also stated: "The [FEIS] for the land exchange documented that the Antelope [AMP] would be updated prior to any change in grazing capacity resulting from the land acquisition. The AMP update would address grazing practices (capacity, timing, and duration) in Round Meadow." (Sept. 2008 AR 1837-1841.) A biological evaluation for sensitive animal species for the project was prepared. It stated in part that:

> Round meadow is a seasonally flooded inland wetland that was ditched and drained in the 1970's. The land was previously in private ownership, and was acquired through a land exchange in the early 1990's. The meadow is approximately 250 acres in size. Several perennial springs drain into the meadow. The surrounding uplands were previously harvested for timber, and cattle grazing is ongoing. Several layers of barbed wire fence surround the meadow. All are in varying states o[f] disrepair. Post restoration the fence will be repaired/replaced around the meadow, and grazing will take place for a restricted period each year until meadow recovery is well underway.

(Sept. 2008 AR 1823-1836.)

A May 2004 post-restoration review of Round Meadow was conducted by two forest hydrologists and a forest fisheries biologist. An evaluation showed that the project was "a huge success." The report also stated that, "Another restoration aspect not shown in the photos is that the district is also currently constructing a fence to exclude cattle grazing indefinitely." (AR 1747-1752.)

In 2004, U.S. Fish & Wildlife Service conducted a Species Assessment and determined that listing of the Oregon spotted frog continued to be "warranted but precluded." (Sept. 2008 AR 1952.) The Forest Service Region 6 lists the Oregon spotted frog as a "Sensitive Species," meaning that its viability is a concern due to significant current or predicted downward trends in populations or habitat. (Sept. 2008 AR 2419, 2850, 2854.)

In June 2005, the Forest Service conducted an ISSSP survey in various survey areas in the Forest including the Round Meadow Outlet, for sensitive mollusk species and opportunistic surveys for Oregon Spotted Frogs and aquatic lichen. (AR 1989, 1989-2030, 5212; see AR 2223-2227; Sept. 2008 AR 3272.) Another ISSSP survey in 2006 was conducted in the Forest including a portion of Round Meadow, for six sensitive mollusk species and an aquatic lichen. (AR 4651.)

In late 2005 or early 2006, in a document entitled, "Concerns about Oregon Spotted Frog" in the Jack Creek Drainage, the concern was expressed that the biological evaluation prepared for the Allotment grazing permit completed in 1995 did not address the Jack Creek population of spotted frogs and no biological evaluation had been completed to determine the impacts of grazing on the population. Completing a biological evaluation was recommended. (AR 1-3.)

In a May 2006 Allotment report, it was reported that six sensitive mollusks species and one endangered species had been found in surveys in 2005 and 2006. It was noted that, "Nearly every spring we visited is impacted by livestock, most are destroyed with no potential habitat left for mollusks." It was also noted that no biological evaluation had been done to address these species. (Sept. 2008 AR 2581-2582, 2678-2679; see Sept. 2008 AR 3272.)

Permitted livestock grazing has occurred on the Allotment since 1909. (Sept. 2008 AR 402.)

A 2006 permit issued to Lawrence and Marjorie Iverson authorizes grazing on the Allotment of 315

cow/calf pairs of cattle for the period of use from July 1 to September 30.[1] (Sept. 2008 AR 2705-

17.)

The 2006 Permit was modified in May 2008 to change the grazing season to August 1 to

September 30. The modification further provided that "No grazing authorized on the [Allotment]

until the Jack Creek Riparian Fence is completed and livestock access to Oregon Spotted Frog

habitat along Jack Creek is controlled."[2] (Sept. 2008 AR 3760.)

While many threats to the Oregon spotted frog populations have been identified, one likely

threat is livestock grazing. (AR 2244-51, 2270, 2511, 3933, 4442; Sept. 2008 AR 2076-2077, 2216-

2217, 2337, 2338, 2850-2851, 2866-2867, 3540, 3824-3826.) In a March 2007 conservation

assessment prepared by the Forest Service and the Bureau of Land Management, potential effects of

grazing were identified as direct trampling, impacts on vegetation and secondary effects, and water

quality changes, although cause-and-effect information was lacking. A preliminary analysis of a

2005 telemetry study at Jack Creek implied that Oregon spotted frogs preferred ungrazed exclosures

as grazing pressure increased through summer. (AR 0003, 2247-48, 3933; Sept. 2008 AR 2337-

---

[1] At the same time, the Forest Service granted a Term Private Land Grazing Permit
to the Iversons, for 104 cow/calf pairs of cattle to graze on the Allotment for the period of use from
July 1 to September 30. (Sept. 2008 AR 2718.)

[2] It appears that the modification to the grazing season dates was for the 2008 season only.
The modification states in part that the permit was modified for the reason that it "Allows for timely
completion of the Jack Creek Riparian fence, assuring no permitted grazing impacts to Oregon
Spotted Frogs or occupied Oregon Spotted Frog habitat during 2008." (Sept. 2008 AR 3760; see
AR 3225.)

2338.) Citing the 2005 study,[3] a 2008 Allotment environmental assessment prepared by a consulting firm and an April 2010 species assessment for the Oregon spotted frog prepared by USFWS, each stated that a "moderate" level of livestock grazing would probably improve habitat, the 2010 assessment stating "if streambank vegetation were very dense," by creating essential open water areas and allowing very cold water temperatures to increase. (AR 2709, 3933.) However, heavy grazing, such as was occurring on private lands on Jack Creek, "likely" was degrading the quality of frog breeding habitat and reducing reproduction. (AR 3933-34.)

In January 2008, Regional Forester Goodman sent the updated sensitive species list to forest supervisors. The letter included the statement that, "The effects of any action authorized, funded, or carried out by the FS on a Federal listed, Federal Proposed, or Sensitive species will be analyzed in a Biological Evaluation." (AR 2458-2463.)

The 3.5 mile Jack Creek riparian fence constructed to control cattle access to the perennial reach of Jack Creek and provide protection to the Oregon spotted frog and its habitat on forest land was completed by early August 2008. (Sept. 2008 AR 3824-3826, 3856-3860; see AR 2441, 3882.)

In the AOI dated August 1, 2008, signed by District Ranger Fred Wahl, the Forest Service stated that the "2008 Authorized Use" was August 1 to September 30 of 419 pair (315 USFS and 104 private) in the Antelope pasture.[4] (AR 2560-2565.) In a notation to authorized land use, the 2008

---

[3]    The 2010 assessment noted that the 2005 Shovlain study was the most recent work monitoring effects of livestock grazing on Oregon spotted frogs. It compared grazed and ungrazed sections of stream/riparian wetlands. (AR 2248, 3933.)

[4]    In three footnotes to grazing season dates, it is noted that the turn-on and off dates were modified from July 1 to September 30, to August 1 to September 30, in May 2008 by the Chemult District Ranger, Fred Wahl, "to address litigation." (AR 2560, 2561.)

AOI provided: "There will be no cattle grazing on the parcels of NFS land encompassed by the

upper and lower Jamison pasture fences, at least until completion of the Antelope Allotment AMP

or, unless the Iversons independently fence their private land out from intermingled NFS property."

(AR 2561.) In the "Grazing Strategy" section of the AOI, it was stated that,

> "***Jack Creek is of special concern***–Please manage the cattle by herding them away
> from the Jack Creek riparian fence in the early part of the grazing season and keep
> stock on the north part of the allotment in the later part of the season.
> . . . .
> In addition to the proposed distribution schedule, the permittee needs to ride and
> check the newly created Jack Creek riparian fence to insure there is no breach of cattle
> to the no-graze portion of Jack Creek (i.e. behind the newly constructed fence). The
> permittee shall take quick action at a breach location to assure that cattle do not graze
> the closed-off area.

(AR 2562 (italics and bold in original).) Under "Herding," it was stated that, "Keep cattle moving

and away from riparian zones as often as possible." (AR 2562.)

The Allotment was surveyed in September 2008 and September 2009 for terrestrial mollusks;

species were found at most of the sites surveyed including the Round Meadow and Jack Creek

Meadow sites. (AR 2626, 2666, 2615-67, 3223, 3510-38, 3546-54, 3628, 3627-28.) Some

surveyors noted evidence of cattle such as manure and other impacts from cattle grazing. (See AR

1990, 1995, 2007, 2021-2022, 2028, 2638, 2648.)

Two modifications to the 2006 permit in May 2009 added the Jack Creek riparian fence to

the maintenance responsibility of the permittee, (AR 4429), and reduced the permitted livestock

numbers from 315 cow/calf pairs to 275 cow/calf pairs for the July 1 to September 30  season of use,

(Second Wahl Decl. & Att. 3).[5] Permit Modification No. 3 states: "Reduction is to account for the

_____

[5]    The Second Wahl Declaration was filed in Center for Biological Diversity v. Wagner,
08-302-CL (D. Or.) as docket #117. It appears that the third permit modification is not included in

Jack Creek Riparian pasture capacity that will not be available until the Allotment management Plan is updated." (Second Wahl Decl ¶4 & Att. 3.[6])

The 2009 AOI, dated June 10, 2009, and signed by Ranger District Fred Wahl, stated the "2009 Authorized Use" on the Antelope/Chemult Allotment was for July 1 to September 30 for 275 pair, plus 104 private. (AR 3225-3230.) The AOI states: "There will be no cattle grazing on the parcels of [NFS] land encompassed by the upper and lower Jamison pasture fences, at least until completion of the Antelope Allotment AMP or, unless the Iversons independently fence their private land out from intermingled NFS property." In the "Grazing Strategy" section of the AOI, it was stated that, "***Jack Creek is of special concern****. No grazing is authorized within the Jack Creek Riparian Pasture or the Jamison Pasture*. (AR 3226 (italics and bold in original.) Under "Herding," it was stated that, "Keep cattle moving and away from riparian zones as often as possible." (AR 3227.) In the "Maintenance Responsibilities" section, it was stated: "Your responsibilities are for maintenance of the Antelope-Chemult Allotment boundary fence, along with the Jack Creek Riparian Fence. The boundary fences noted here are the boundaries with Tobin Cabin Pasture and the Jack Creek Sheep Allotment." (AR 3227.)

A December 2009 wildlife end of season report was prepared regarding concerns for Oregon spotted frog on Jack Creek and sensitive mollusks in fen/spring habitats. The report noted that cattle were permitted to turnout without biological evaluations addressing the spotted frog or mollusks on the Allotment which was stated to be inconsistent with the Manual direction at section2672.1, and

---

the administrative record. In referring to the modification reducing the permitted cow/calf pairs, defendants rely on this declaration. (Defs. Mem. at 3 note 2.)

[6]   See note 5.

the failures to complete biological evaluations put the agency in a difficult legal position. It was

reported that cattle breached the exclosure fences into frog habitat on Jack Creek in late June through

late October 2009, with observations on weekly basis and distributed all along the excluded area;

despite effort to get cows out and electric wire, cows were "commonly seen" inside no-graze fenced

area all season long. It was reported that cattle were "grazing and drinking freely" within sensitive

mollusk species habitats in spring/fen complex in the Jack Creek headwaters and more than four

dozen other smaller springs/fens habitat; manure and urine in water lowered water quality, and hoof

action/postholing created pedestals and denuded vegetation; it was noted that "Habitat is being

degraded/destroyed." It was recommended that biological evaluations be completed and

"appropriate action should be taken to control livestock and protect spring/fen habitat." (AR 3678-

3681.)

The Forest Service prepared a summary inventory of bryophyte and sedge wetlands found in

the 2009 field season. The report noted that "Much of the suitable habitat on Chemult is located in

the Jack Creek and Antelope grazing allotments, where wetlands and meadows provide a major part

of the forage base for livestock." Survey observations were that management activities were

occurring at most of the sites: "Most of the potential and occupied habitat for the target species in

this survey, and all but one of the newly detected sites are within either the Antelope cattle allotment

or the Jack Creek sheep allotment." It stated that the habitats are essentially fen plan communities

for majority of sites. (AR 3683, 3687, 3771-3775, 3682-3689.)

A conservation agreement for the Oregon spotted frog was reached in early 2010 by the

USFWS, the BLM, the Klamath Marsh National Wildlife Refuge, and the Forest Service. The

purpose of the agreement is to protect and contribute to the conservation of the Oregon spotted frog

by implementing conservation actions for the species on federal lands in the Klamath Basin. (AR 3740-3760.)

In March 2010, the permittee requested to be allowed to graze Round Meadow and some of the larger acreage exclosures in the 2010 grazing season. (AR 3807.) The permittee's request to graze Round Meadow was denied. (AR 4204-4205.)

The 2010 AOI, dated June 15, 2010, provided for grazing 0n the Allotment on the Silver Lake Ranger District and on the Chemult Ranger District.[7] (AR 4270-4275.) The AOI authorized 275 cow-calf pairs and 104 cow/calf pairs private on the Chemult Pasture, a total of 379 cow/calf pairs, beginning mid-July, with all cattle moved onto the Chemult Pasture by August 1, and moved from the pasture beginning September 15, with 90% off Forest by September 30. (AR 4271-4272.) The AOI states:

> The Jack Creek Riparian Pasture on the Chemult Pasture is still in a "no grazing" status until completion of a new Allotment Management Plan. This change was made with permit Modification #3, dated May 7, 2009. It is your responsibility to maintain the Jack Creek Riparian fence in a manner that keeps cattle from accessing the riparian pasture and to monitor the area regularly to minimize/eliminate livestock impacts in this area. Cattle observed in the Jack Creek Riparian Pasture will be reported to you in a timely manner and it is my expectation that you will respond quickly to these reports. Any livestock in the Jack Creek Riparian Pasture will be moved out as soon as possible but no longer than 3 days of you receiving the report. If livestock accessing the Jack Creek Riparian Pasture becomes a chronic problem over the summer or you do not respond in a timely manner, I will consider permit action to rectify the situation.

---

[7]    Previous AOIs were specific to the Chemult District. The Silver Lake Ranger District and the Chemult Ranger District are contiguous grazing allotments. Forest Service documents refer to the Antelope Allotment on the Silver Lake Ranger District, Fremont National Forest, and the Antelope Cattle & Horse Allotment on the Chemult Ranger District, Winema National Forest. The Forest Service proposes to administratively combine the two allotment boundaries into one allotment, referred to as the Antelope Grazing Allotments. (AR 5148, 5148, 5160, 5148-5162.)

(AR 4271.)  In the "Herding" section of the AOI, it was stated that, "Keep cattle moving and away from riparian zones as often as possible."  (AR 4273.)  The "Maintenance Responsibilities" section of the AOI stated: "Maintenance of structures needed to control livestock is an issue within the Antelope/Chemult allotment.  We are assessing the condition of all structures on the allotment in preparation for a new Allotment Management Plan.  Please refer to your Term Grazing permit for maintenance responsibilities."  (AR 4273.)

The permittee appealed the denial of the request to graze Round Meadow in the 2010 season. (AR 4423.)

Wetland Restoration and Oregon spotted frog monitoring in Jack Creek have been proposed for the years 2011-2015.  (AR 4442-4443.)

Fen surveys were conducted in July 2010 for sensitive bryophytes.  (AR 4447-4455.)

In a letter to the Forest Supervisor, District Ranger Machado explained that she had denied the permittee's request to graze Round Meadow based on a lack of surveys and biological evaluations for sensitive species within the stated meadows.  She indicated she had subsequently learned that "enough surveys, for the species in question, had been conducted in Round Meadow to allow for the completion of biological evaluations." District Ranger Machado recommended that biological evaluations, including mitigations, be completed for the sensitive species "based on a proposed action of allowing some time-controlled grazing within Round Meadow for this season," and that the grazing be allowed if the action would not cause a trend toward federal listing for the sensitive species.  (AR 4729-4732.)  The Forest Supervisor concurred.  (AR 4766.)

During the last week of August 2010, District Ranger Sabo sent a scoping letter seeking comment regarding the proposed fence on Round Meadow to parties on the district public interest

mailing list. He stated that the project qualified to be excluded from documentation in an EIS or EA,

citing a regulation. Parties responded to the scoping letter and to the issue of cattle grazing on

Round Meadow. (AR 4775, 4796-4799, 4800-4803, 4804-4807, 4808-4811, 4812-4815, 4816-4819,

4820, 4821-4823, 4841-4842, 4852-4855, 4856-4857, 4859-4860, 4872-4875, 4876-4880, 4881-

4882; see AR 4899-4902, 4912.)

      In August 2010, forest fisheries biologist and forest hydrologist conducted field reviews of

Round Meadow for restoration review. They each assessed the effects of the proposed grazing on

Round Meadow. The biologist concluded that the proposed level of livestock grazing would

maintain the existing condition of the vegetated and simulated beaver dams in the meadow. The

hydrologist concluded that the proposed grazing and exclusion of cattle from the 2 spring areas

would be adequate to protect water resources in Round Meadow. (AR 4831-4834, 4835-4837.) The

interagency soil scientist  assessed the effects of the proposed grazing including the fencing of the

wet areas around the springs and concluded that no detrimental effects on soils resource was

anticipated as a result of the proposed action. (AR 4862-4863.) The forest wildlife biologist and

forest botanist each assessed the effect of grazing on sensitive species and habitat inside and outside

the temporary fence on Round Meadow. It was recommended that a fence be constructed to protect

high quality mollusk habitat near springs. (AR 4838-4840, 4894-4896.)

      Biological evaluations relating to the Round Meadow temporary fence  were prepared in

August and September 2010 by the forest wildlife biologist, the forest fisheries biologist, and the

forest botanist. (AR 4776-4784, 4785-4795, 4885-4893.)

      On September 3, 2010, District Ranger Sabo prepared a Decision Memo for installation of an

electric fence in Round Meadow detailing his decision to implement a short-term closure to livestock

14   - ORDER AND REPORT AND RECOMMENDATION

grazing to protect springs and sensitive plant habitat within the Meadow. The fence would enclose approximately 75 acres of the 300-acre meadow, and be removed shortly after the September 30, 2010, close of the grazing season. He specifically found that no adverse effects to Forest Service sensitive species would occur. District Ranger Sabo found that his decision was excluded from documentation in an EA or EIS by a categorical exclusion relating to short-term resource protection. (AR 4899-4902, 4903.)

On that same date, District Ranger Sabo directed that an amendment to the 2010 AOI be prepared which would allow for time-limited grazing in Round Meadow from September 4 through September 30, 2010, of up to 80 head of livestock from among the livestock numbers already authorized under the permit. He noted that a temporary electric fence would be constructed. District Ranger Sabo stated:

> I do believe that time-limited grazing can occur without detrimental damage to soils, hydrology, wildlife, aquatic, plants or heritage resources. I have received specialist information from Wildlife, Botany, Fisheries, Hydrology and Soils that has lead to my conclusion. **I have two goals** 1) Time limited grazing this field season and 2) Protection of springs, sensitive species habitats, heritage resources and restoration efforts that have already taken place.

In the directions for the amendment to the AOI, District Ranger Sabo included the following direction: "Occurrences of the sensitive bryophyte *Tomentyprum nitens*, identified and verified outside the temporary fence may require additional protection measures to be instituted as determined by the Forest Botanist." (AR 4897-4898.)

An amended 2010 AOI dated September 7, 2010, was issued to the permittee authorizing the permittee to enter Round Meadow pasture beginning September 5 with up to 80 cow-calf pair, to be removed from the Round Meadow pasture and off the Allotment by September 30. An

approximately ½ mile of electric fence on the pasture would protect sensitive groundwater dependent

ecosystems and/or species. The amended AOI stated:

> The electric fence will be critical to achieve the protection needed at the springs. It is
> imperative you monitor the status of this fence on a regular basis to assure that there
> is no compromise to its integrity. If through monitoring it is determined the fence
> cannot keep cows from the protected areas, you will clear the pasture of cows
> immediately.

(AR 4918-4919.)

In a September 17, 2010, memorandum to the file, forest environmental coordinator, Glen

Westlund, considered the questions of whether the acquired lands from the land exchange became

part of the Allotment and could grazing occur within Round Meadow. Relying on the FEIS and

other documents, coordinator Westlund found that the acquired lands have been added to the

Allotment and could be used for grazing; and "Grazing has not been excluded as an appropriate

management activity from Round Meadow. Grazing needs to be controlled such as to not retard

restoration effects." In making these findings, he quoted portions of the EIS and noted that the

acquired lands would be used for grazing without increasing grazing capacity and without

modification to existing grazing permit; grazing capacity cannot be increased without updating the

AMP through the NEPA process; grazing must be consistent with regulations and Forest Plan

direction. He also cited the Round Meadow restoration project decision memo in which it was stated

that the perimeter fence would control grazing during recovery. He stated, "As long as the grazing

does not impact the ability to reach [recovery] goals, grazing can be permitted." He compared the

Round Meadow decision memo with others in which it was stated that fences were constructed to

exclude cattle or prevent damage from cattle. As to those exclosures, coordinator Westlund stated

that it would not be appropriate to allow grazing without additional NEPA analysis. (AR 4761-4764.)

## LEGAL STANDARDS

Judicial review of agency action is governed by the Administrative Procedure Act (APA). 5 U.S.C. § 706. The reviewing court

> must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (citations omitted), abrogated on another ground by Califano v. Sanders, 430 U.S. 99 (1977). Agency decision-making is accorded a "presumption of regularity." Akiak Native Cmty. v. U. S. Postal Serv., 213 F.3d 1140, 1146 (9th Cir. 2000). While such review is deferential to the agency action taken, Lands Council v. Martin, 529 F.3d 1219, 1225 (9th Cir. 2008), the court must not "'rubber-stamp'" the agency action as correct, N. Spotted Owl (Strix Occidentalis Caurina) v. Hodel, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

As pertinent here, the court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action is found to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)(D). "'[I]f an agency fails to consider an important aspect of a problem . . . [or] offers an explanation for the decision that is contrary to the evidence,' its action is arbitrary and capricious." Or. Natural Res. Council Fund v. Goodman, 505 F.3d 884, 888-89 (9th Cir. 2007) (quoting Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir. 2005)). "An agency action is also arbitrary and capricious if the agency fails to

'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."'" Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv., 12 F. Supp.2d 1121, 1131 (D. Or. 1997) (quoting Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

    The parties have filed cross-motions for summary judgment. Because the court's review under the APA is generally limited to the administrative record, see infra, no facts are in dispute. However, summary judgment may be used as a vehicle for the court to conduct its review of the record. The court's role is "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

### Whether Plaintiffs' Challenges to the 2008-2010 AOIs are Moot

    Defendants contend that the expired AOIs are moot and plaintiffs do not fit within the extraordinary exception to the mootness doctrine. Plaintiffs respond that the capable of repetition yet evading review exception applies and also that, because effective relief is still available to remedy past violations, their claims are not moot.

    "Generally, an action is mooted when the issues presented are no longer live and therefore the parties lack a legally cognizable interest for which the courts can grant a remedy." Alaska Ctr. for Env't v. U.S. Forest Serv., 189 F.3d 851, 854 (9th Cir. 1999) (citing Murphy v. Hunt, 455 U.S. 478, 481 (1982)); Forest Guardians, 329 F.3d at 1094 ("'The question is whether there can be *any* effective relief.'"); Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1065 (9th Cir. 2002). The burden on a defendant of demonstrating that a case is moot is a heavy one, and "defendants in

NEPA cases face a particularly heavy burden in establishing mootness." Cantrell v. City of Long Beach, 241 F.3d 674, 678 (9th Cir. 2001).

Plaintiffs contend that the court can order the Forest Service to suspend or reduce grazing, or impose other measures which could mitigate the damage caused by the challenged grazing which would allow the resources to recover. The Ninth Circuit has found that, "where the violation complained of may have caused continuing harm and where the court can still act to remedy such harm by limiting its future adverse effects, the parties clearly retain a legally cognizable interest in the outcome." Nw. Envtl. Def. Ctr. v. Gordon, 849 F.2d 1241, 1245 (9th Cir. 1988). In Gordon, harm to the coho salmon population could be repaired or mitigated after the close of the fishing season by allowing more fish to spawn the following year. Similarly, in Forest Guardians, 329 F.3d at 1094, the court found that if the challenged activity was determined to violate NFMA, any damage to land could be mitigated by ordering the Forest Service to develop tactics such as moving or removing livestock from the allotments at issue. See Cantrell, 241 F.3d at 678 -79 (effective relief "may still be available" despite destruction of bird habitat) (and cases cited).

Recently, Judge Haggerty in Oregon Natural Desert Association v. Tidwell, 716 F. Supp.2d 982, 993-95 (D. Or. 2010), found that an NFMA challenge to pre-2009 annual grazing authorizations were not moot because "any damage could be remedied through injunctive relief restricting future grazing." The court stated: "The grazing that takes place on each allotment during a season can have carryover affects [sic] that might last one or more seasons into the future. The fact that new annual grazing authorizations have been issued does not mean that damage from previous seasons cannot be remedied." Id. at 994.

This court finds that the same is true here. Because effective relief may be available to remedy any alleged harms of which plaintiffs complain, the court finds that plaintiffs' claims are not moot.

An exception to the mootness doctrine applies where the issue is capable of repetition yet evades review. This limited exception applies only to extraordinary circumstances where: "'(1) the duration of the challenged action is too short to be fully litigated before it ceases; and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again.'" Am. Rivers v. Nat'l Marine Fisheries Serv., 126 F.3d 1118, 1123 (9th Cir. 1997) (quoting Alaska Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle, 829 F.2d 933, 939 (9th Cir. 1987)).

Defendants have backed away from their initial argument that the duration of the AOIs at issue is not too short to be fully litigated before mootness. In considering the duration of the challenged action, the court's inquiry is whether the action would run its course before the Ninth Circuit or the Supreme Court could consider the case. Johnson v. Rancho Santiago Cmty. Coll. Dist., 623 F.3d 1011, 1019 (9th Cir. 2010), cert. denied, ___ U.S. ___, 131 S. Ct. 2096 (2011) (citing Biodiversity Legal Found. v. Badgley, 309 F.3d 1166, 1173 (9th Cir. 2002)). Plaintiffs' challenges to the AOIs issued here, which have an approximate three to four month span, could not be fully litigated before the activity ceased and, thus, the first prong is satisfied. See Greenpeace Action v. Franklin, 14 F.3d 1324, 1329 (9th Cir. 1992) (challenged regulation in effect for less than one year); Johnson, 623 F.3d at 1019-20 (three year term of challenged agreement).

//

Defendants contend that the second prong is not satisfied here because future grazing will occur under new and unique AOIs responsive to conditions on the Allotment and, therefore, there is no reasonable expectation that future AOIs will be the "same action" as the challenged expired AOIs. Plaintiffs contend that, other than slight deviations in livestock numbers and grazing schedule, the 2008-2010 AOIs are very similar in their instructions to the permittee. They contend that the Forest Service has not significantly altered grazing on the Allotment since 2008 and it is reasonable to expect that defendants will continue to authorize grazing on the Allotment in 2011 without additional protections for sensitive species, which is the basis of their claims in this case.

The Ninth Circuit has found that the second prong of the exception requires "some indication" that the challenged conduct will occur again, that is, that "'it is reasonable to expect that the [Forest Service] will engage in conduct that will once again give rise to the allegedly moot dispute.'" Alaska Ctr. for Env't, 189 F.3d at 856 (quoting Miller *ex rel.* N.L.R.B. v. Cal. Pac. Med. Ctr., 19 F.3d 449, 454 (9th Cir. 1994), abrogated on other grounds as recognized by Small v. Operative Plasterers' & Cement Masons' Int'l Ass'n Local 200, 611 F.3d 483 (9th Cir. 2010)). Here, while the Forest Service may respond to changing conditions, new science, new rules, or permit noncompliance in future AOIs, as defendants assert that it does annually, defendants do not argue or offer anything to demonstrate that livestock grazing in 2011 and later seasons will occur with additional protections for sensitive species, other than the Jack Creek riparian fence which was constructed in 2008 to protect the Oregon spotted frog, one of the sensitive species at issue in this case. On this record, it is reasonable to expect that the Forest Service will issue the 2011 AOI with

//

similar instructions to, and without significant change from, the 2008-2010 AOIs at issue, which is the same conduct of defendants challenged in this case.[8]

Even if plaintiffs' claims are moot as defendants contend, the court finds that plaintiffs' claims satisfy the capable of repetition yet evading review exception to the mootness doctrine. Accordingly, defendants' motion for summary judgment on this ground should be denied.

### Whether Plaintiffs' Challenges to the 2008 AOI are Barred by Res Judicata

Defendants contend that, because plaintiff KS Wild could have brought a claim as to the 2008 AOI in previous litigation, Center for Biological Diversity v. Wagner, 08-302-CL (D. Or.) (Wagner), plaintiffs are precluded from challenging the 2008 AOI in this action.

The Supreme Court has stated that res judicata, or claim preclusion, "refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 77 n.1 (1984). The federal law of claim preclusion applies to the court's determination in this case. Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 322 F,3d 1064, 1077 n.10 (9th Cir. 2003). In the Ninth Circuit,

> Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action. In order for res judicata to apply there must be:  1) an identity of claims; 2) a final judgment on the merits, and 3) identity or privity between parties. Blonder-Tongue Lab. v. University of Ill. Found., 402 U.S.  313, 323-24 [] (1971).

---

[8]    At oral argument of the parties' motions, defense counsel represented that the 2011 AOI was issued in May 2011.

W. Radio Servs. Co. v. Glickman, 123 F.3d 1189, 1193 (9th Cir. 1997); Tahoe-Sierra Pres. Council, 322 F.3d at 1077 (and cases cited).

Plaintiffs contend that the Wagner judgment does not have preclusive effect here because there is no identity of claims.  They argue that plaintiff KS Wild was not required to file a supplemental complaint against the 2008 AOI in the prior action because the claim arose during the course of the suit.  They further contend that the claims against the 2008 AOI in this case do not arise from the same nucleus of facts and, thus, are not precluded.  Defendants reply that KS Wild's challenge to the 2008 AOI arise from the same nucleus of facts as Wagner.  They assert that the administrative record in Wagner included documents dated into late August 2008, including the 2008 AOIs which were a matter of record before that case was briefed on the merits.  They assert that any issue with the 2008 AOIs could have been litigated by KS Wild in Wagner and the claims did not arise later factually.

The Ninth Circuit has held that "'The central criterion in determining whether there is an identity of claims between the first and second adjudications is "whether the two suits arise out of the same transactional nucleus of facts."'" Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 714 (9th Cir. 2001) (quoting Frank v. United Airlines, Inc., 216 F.3d 845, 851 (9th Cir. 2000), cert. denied, 532 U.S. 914 (2001)).  New claims which are based on the same nucleus of facts may still be precluded if they could have been brought in the earlier action.  Tahoe-Sierra Pres. Council, 322 F.3d at 1078.

In arguing that there is no identity of claims, plaintiffs rely on cases in which the majority of courts, both state and federal, have held that, "claim preclusion extends to claims in existence at the time of the filing of the original complaint in the first lawsuit and any additional claims actually

23   - ORDER AND REPORT AND RECOMMENDATION

asserted by supplemental pleading." Carstarphen v. Milsner, 594 F. Supp.2d 1201, 1210 (D. Nev.

2009) (and authorities cited, including 18 Charles Alan Wright, Arthur R. Miller & Edward H.

Cooper, Fed. Practice & Procedure § 4409 (2d ed. 2002) ("Most cases rule that an action need

include only the portions of the claim due at the time of commencing that action, frequently

observing that the opportunity to file a supplemental complain is not an obligation." (and n.9);

Hatch v. Boulder Town Council, 471 F.3d 1142, 1149-51 (10th Cir. 2006) (applying federal claim

preclusion law; "For purposes of *res judicata*, the scope of litigation is framed by the complaint [in

the prior action] at the time it is filed. . . . Although a plaintiff may seek leave to file a supplemental

pleading to assert a new claim based on actionable conduct which the defendant engaged in after a

lawsuit is commenced, he is not required to do so." (quoting Computer Assocs., Int'l, Inc. v. Altai,

Inc., 126 F.3d 365, 369-70 & n.7 (2d Cir. 1997)).    For purposes of res judicata, "[t]he scope of the

litigation is framed by the complaint at the time it is filed." L.A. Branch NAACP v. L.A. Unified

Sch. Dist., 750 F.2d 731, 739 (9th Cir. 1984) (applying California law).

　　　　The record shows that the 2008 AOI is dated August 1, 2008, which is after Wagner was

commenced on March 11, 2008.  Following issuance of the 2008 AOI during the course of the

pending litigation, plaintiffs in the case had no obligation to file a supplemental complaint including

any challenge to the 2008 AOI.  Although the court discussed the 2008 AOI in its 2009 opinion, as

defendants point out, the 2008 AOI was reviewed in relation to determining whether there were

changed circumstances which might make plaintiffs' NFMA challenges in the case moot.  See L.A.

Branch NAACP, 750 F.2d at 739 n.9.

//

Even considering this law, a plaintiff cannot avoid supplementing the complaint with facts which are part of the same transaction asserted in the complaint. Hatch, 471 F.3d at 1149. In discussing federal claim preclusion law, the Hatch court stated:

> The filing of the plaintiff's complaint frames the scope of litigation, establishing a transactional nexus into which facts and claims are fitted or excluded for purposes of claim preclusion. "New" claims, arising after the complaint has been filed, but before judgment, may be excluded from this transactional nexus, and thus be litigated in a subsequent action.

Id. at 1150. Thus, it was plaintiffs' complaint filed in Wagner, which challenged 2000 through 2007 AOIs, which framed the transactional nucleus of facts, and not the administrative record filed by defendants in the case, as defendants here argue.

On this record, the court finds that the identity of claim element of the res judicata bar is not satisfied.

Plaintiffs also contend that there is no identity or privity between parties in Wagner and the parties in this case. They contend that plaintiff ONDA was not represented in the prior suit and simply because one member of plaintiff KS Wild happens to be a member of plaintiff ONDA so as to provide standing for both plaintiffs does not mean that plaintiff KS Wild adequately represented ONDA in Wagner. Defendants contend that plaintiff KS Wild, who is bound by the 2009 judgment in Wagner seeks to avoid its preclusive effect by relitigating through plaintiff ONDA as its proxy, using a single standing declarant, Ms. Goodwin, whose interests were represented in the earlier action.

Of the six categories of exceptions to the general rule prohibiting nonparty preclusion articulated by the United States Supreme Court in Taylor v. Sturgell, 553 U.S. 880, 893-95 (2008),

25 - ORDER AND REPORT AND RECOMMENDATION

two are at issue here.  The Supreme Court found that, "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was '"adequately represented by someone with the same interests who [wa]s a party"' to the suit."  Id. at 894.  The Court stated that a party's representation of a nonparty is "'adequate' for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty."  Id. at 900 (citations omitted); see id. at 894-95 (class actions and suits brought by fiduciaries).  The court agrees with plaintiffs that there is nothing in the record to show that plaintiff KS Wild understood or intended to act as a representative of ONDA in Wagner or that the court in that action sought to protect ONDA's interests.  See id. at 905;  Save the Peaks Coal. v. U.S. Forest Serv., No. CV 09-8163-PCT-MHM, 2010 WL 4961417, at *13 (D. Ariz. Dec. 1, 2010) (fact that plaintiffs in later litigation were members of or affiliated with plaintiff organizations in earlier case insufficient to establish representation).  The court finds that the adequate representation exception to nonparty preclusion is not met here.

Also relevant is the exception that, "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy."  Taylor, 553 U.S. at 895.  The Taylor Court stated that preclusion was appropriate where "a person who did not participate in a litigation later brings suit as the designated representative of a person who was a party to the prior adjudication," and when a nonparty subsequently brings suit as an "agent" for a party bound by a judgment.  Id.  This court is not persuaded by defendants' argument that because Ms. Goodwin, as a member of plaintiff KS Wild, is bound by the earlier judgment, and plaintiff ONDA has not come forward with anyone but Ms. Goodwin to show its interests, plaintiff KS Wild is relitigating the Wagner case through plaintiff

ONDA as its proxy such that ONDA should be precluded from challenging the 2008 AOIs. There is nothing to show that plaintiff ONDA is an agent of plaintiff KS Wild. See Save the Peaks Coal., 2010 WL 4961417, at *14 (finding no privity through proxy where plaintiffs from earlier litigation were "intertwined" with plaintiffs in later litigation). The court finds that the proxy exception to nonparty preclusion is not met here.

Neither side disputes that a final judgment on the merits was entered in Wagner.

On this record, neither the identity of claims element nor the identity of parties element is satisfied and res judicata does not bar plaintiffs from challenging the 2008 AOIs. Defendants' motion for summary judgment on this ground should be denied.

### NFMA Claim - Allotment

Once the Forest Service has developed its forest plan, NFMA requires that "all subsequent agency actions must be consistent with the governing plan." League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen, 615 F.3d 1122, 1125 (9th Cir. 2008) (citing 16 U.S.C. § 1604(i)); 36 C.F.R. § 219.10. Issuance of an AOP or AOI is a site-specific action which must be consistent with the Forest Plan. Buckingham, 603 F.3d at 1077; Native Ecosystems v. Tidwell, 599 F.3d at 934.

Plaintiffs contend that the Forest Service has failed to comply with directions in the Winema Forest Plan which are emphasized by the Forest Service Manual. They contend that defendants failed to comply with the goals, objectives, and standards and guidelines in the Forest Plan by authorizing grazing on the Allotment after discovering many sensitive plant and animal species in the unique fens on the Allotment which are impacted by grazing, and that the Oregon spotted frog

population in Jack Creek on the Allotment continue to experience impacts from grazing. The

following goals, objectives, and standards and guidelines in Chapter 4 Forest Management Direction

of the Forest Plan are at issue:

**Fish and Wildlife - Goals**
5. Maintain or enhance the characteristics of riparian areas, wildlife habitat, and fish
habitat near or within riparian ecosystems.
6. Manage habitat for the perpetuation and/or recovery of plants and animals listed as
threatened, endangered, or sensitive.
7. Provide habitat for viable populations of all existing native and desired non-native
vertebrate species.

**Fish and Wildlife - Objectives**
- Improve riparian areas to provide enhanced habitat for wildlife and fish.
- Continue to survey and develop biological evaluations for sensitive species.
Develop individual species management guidelines for sensitive species.

**Range - Goals**
16. The demand for livestock grazing will be met only when it does not conflict with
other uses.

**Soil and Water (Watershed Management) - Goals**
23 Water bodies, stream courses, and wetlands, their riparian vegetati8on, and the
immediately adjacent upland areas will be managed to stabilize stream channels;
prevent soil erosion; and maintain or improve water quality, fish habitat, recreation
opportunities, and riparian/wetland habitat for dependent fish and wildlife species and
dependent aquatic species.
24 Long-term soil productivity will be maintained.

**Forestwide Standards and Guidelines - Fish, Wildlife, and Sensitive Plants**
4-1 At the Forest level, fish and wildlife habitat shall be managed to maintain viable
populations of all existing native and desired non-native plant and animal species.
Distribution of habitat shall provide for species viability and maintenance of
populations throughout their existing range on the Forest.

**Forestwide Standards and Guidelines - Fish, Wildlife, and Sensitive Plants -
Endangered, Threatened, or Sensitive Species**
4-3 All Forest Service projects, programs, and activities conducted, funded, or
permitted shall be reviewed for possible effects on threatened, endangered, or
sensitive species of animals and plants.

Biological evaluations shall be prepared for each project authorized, funded, or conducted on National Forest System land to determine the possible effects the proposed activity will have on endangered, threatened, proposed, or sensitive species. 4-7 Habitat use of the Winema National Forest by these species shall be evaluated. Habitat requirements sufficient to maintain the species shall be provided.

**Forestwide Standards and Guidelines - Soil and Water**
12-3 Land management activities shall be planned and conducted to maintain or to improve soil productivity and stability.

**Forestwide Standards and Guidelines - Soil and Water - Riparian Ecosystems (Streams, Stream-Side Areas, Floodplains, and Wetlands)**
12-10 In riparian ecosystems, hydrologic conditions and riparian habitat shall be maintained or improved.

(S8 AR 72, 78, 82, 113, 139, 140.) Specifically, plaintiffs focus on directions in the Forest Plan that the Forest Service maintain or enhance riparian areas, hydrology, and wildlife habitat within riparian ecosystems; manage habitat to protect sensitive species and maintain viable populations and distribution of native plant and animal species throughout forest, (S8 AR 72, 82, 113, 140); and direction in the Forest Plan and Forest Service Manual "to complete [biological] evaluations to assess the effects of [grazing]," (S8 AR 72, 113). (Pls. Brief at 25.)


Defendants first argue that plaintiffs' challenge to general "goals" and "objectives" cannot serve as the basis for a NFMA violation. Courts, however, look to whether language of the provision is mandatory by the use of "shall" or "will" or whether the language is merely suggestive, such as by the use of "may." See W. Watersheds Project v. Bennett, 392 F. Supp.2d 1217, 1227 (D. Idaho 2005) (violation of FLPMA's consistency with land use plan requirement where in approving grazing permit BLM did not comply with guideline providing that priority for habitat management "will" be given to habitat or sensitive species, rejecting argument that guidelines were merely

discretionary); W. Watersheds Project v. U.S. Forest Serv., No. CV 05 189 E BLW, 2006 WL

292010, at *10 (D. Idaho Feb. 7, 2006) (adaptive management strategy important to meeting Forest

Plan standards and objectives not explained in violation of NFMA consistency requirement);

Sequoia Forestkeeper v. U.S. Forest Serv., No. CV F 09-392 LJO JLT, 2010 WL 5059621, at *16-

*17 (E.D. Cal. Dec. 3, 2010) (determining whether special use permit issued by Forest Service

contained conditions appropriate to protect and meet Forest Plan goals), modified on reconsideration,

2011 WL 902120 (Mar. 15, 2011); see also Native Ecosystems v. Tidwell, 599 F.3d at 933-34

(Forest Plan goals and objective to maintain species diversity; use of proxy-on-proxy approach to

ensure viability of species did not comply with NFMA).  Moreover, the Forest Service's issuance of

an AOI is an action which must be consistent with the Forest Plan as a whole, not just the standards

and guidelines contained within it.  See Buckingham, 603 F.3d at 1077; Native Ecosystems v.

Tidwell, 599 F.3d at 934; 16 U.S.C. § 1604(i).  Accordingly, the court will review the provisions

cited by plaintiffs in support of their claim without regard to whether the provisions are goals,

objectives, or standards and guidelines.


The Forest Plan includes in its Objectives for Fish and Wildlife, the objective to "Continue to

survey and develop biological evaluations for sensitive species."  (S8 AR 72.)  In the Forest Plan

Standards and Guidelines for Fish, Wildlife, and Sensitive Plants–Sensitive Species, it is provided at

item 4-3 that,

> All Forest Service projects, programs, and activities conducted, funded, or permitted
> shall be reviewed for possible effects on threatened, endangered, or sensitive species
> of animals and plants.

> Biological evaluations shall be prepared for each project authorized, funded, or
> conducted on National Forest System land to determine the possible effects the
> proposed activity will have on endangered, threatened, proposed, or sensitive species.

(S8 AR 113.) An introduction to the Forestwide Standards and Guidelines provides that the intent of

the word "shall" is that "the action is mandatory in all cases." (S8 AR 104.)

The Forest Service Manual (Manual) provides in its Policy section relating to "Sensitive

Species," section 2670.32, subsection 2, that, "Review programs and activities as part of the National

Environmental Policy Act of 1969 process through a biological evaluation, to determine their

potential effect on sensitive species." (S8 AR 2411-2412.) The Manual provides in pertinent part in

section 2672.4 relating to "Biological Evaluations":

> Review all Forest Service planned, funded, executed, or permitted programs and
> activities for possible effects on endangered, threatened, proposed, or sensitive
> species. The biological evaluation is the means of conducting the review and of
> documenting the findings. Document the findings of the biological evaluation in the
> decision notice. Where decision notices are not prepared, document the findings in
> Forest Service files. . . .

(AR 4711.)[9]

Plaintiffs contend there is nothing in the record to show that the Forest Service reviewed  and

evaluated the effects of the proposed grazing in light of the new information about sensitive plants

and mollusks on the Allotment before issuing the 2008, 2009, and 2010 AOIs, or that it complied

with substantive protections for sensitive species and other resources set out in the Forest Plan when

determining the grazing which should be authorized.

---

[9]    Certain sections of the Manual are attached to an August 2010 email from a forest
wildlife biologist to David Sabo. (AR 4710-4712.)
    The court recognizes that the Manual is not binding on the Forest Service and does not have
the force of law. W. Radio Servs. Co. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996).

Defendants initially assert that they have done the review, citing portions of the record. However, the record cited by defendants in support of their assertion contains only evidence of the surveying and field notes conducted on the Allotment.

Defendants agree that a Forest Plan objective for fish and wildlife provides that the Forest Service must "continue to survey" sensitive species and continue to "develop" biological evaluations (BE or BEs) for sensitive species. (S8 AR 72.)  However, defendants argue that the provision does not provide for when BEs must be finally developed and that the Forest Service must have discretion to develop BEs.  As to the Forest Plan mandatory standard and guideline which requires that all Forest Service activities conducted or permitted "shall be reviewed" for possible effects on sensitive species, (S8 AR 72), defendants argue that the Forest Plan does not provide how frequently the Forest Service should make its review and that it is "entirely rational" that it formally review the effects of grazing on the Allotment in the BE that is part of the AMP revision.  (Defs. Reply at 13.)

Defendants are correct that the Forest Plan contemplates development of BEs for sensitive species but that it does not provide for when BEs must be finally developed, nor does it provide how frequently review of Forest Service activities for possible effects on sensitive species should be done.

Defendants also contend that the Forest Plan requires that BEs must be prepared for a proposed "project" and that, under the Forest Service's interpretation of the Forest Plan, BEs are performed for a "new" project rather than for annual "ongoing" grazing activity.  Defendants assert that, "[b]ecause AOIs are squarely within the terms and conditions of the existing grazing permit, there is no Forest Plan requirement that BEs be conducted every year."  (Defs. Reply at 11.) Defendants make this same argument in the context of the review provision of the Forest Plan,

contending that NFMA's mandates apply only to proposed future actions rather than "pre-existing activities such as ongoing grazing." (Defs. Reply at 13-14.)

It is noteworthy that, in making their contentions that a BE applies only to new projects and not to ongoing activity, defendants rely on the January 2008 letter from Regional Forester Goodman addressed to forest supervisors about the updated sensitive species list. In that letter, Regional Forester Goodman states that the updated sensitive list will apply to all projects initiated on or after the date of the letter but that projects initiated prior to that date may use the list or the list in effect when the project was initiated. (AR 2458-2459.) However, right above the paragraph with this information, Regional Forester Goodman states: "The effects of any action authorized, funded, or carried out by the FS on a Federal listed, Federal Proposed, or Sensitive species **will be** analyzed in a biological evaluation." (AR 2459 (emphasis added).)

The review provision includes no limitation that only proposed, future actions shall be reviewed. The review provision requires that "All" Forest Service "activities" which are "conducted" or "permitted" "shall be reviewed" for possible effects on sensitive animal and plant species. (S8 AR 113.) The AOIs at issue, while issued annually, are each a discrete, site specific action, which governs the permittee's grazing operations for the grazing season. ONDA, 465 F.3d at 990; Buckingham, 603 F.3d at 1077. As is the case with the grazing permit and the AMP, each AOI must be consistent with the Forest Plan and the NFMA. Buckingham, 603 F.3d at 1077; Native Ecosystems v. Tidwell, 599 F.3d at 934. The fact that the permitted activity of livestock grazing is "ongoing" on an annual basis does not excuse the Forest Service from conducting the requisite review of the grazing activity permitted on the Allotment for possible effects on sensitive species which is contemplated by the Forest Plan.

Defendants also assert that the BE process is well underway for the AMP revision. The Forest Service cannot rely on the fact that it is in the process of revising the AMP. The current AMP was completed in 1990, over twenty years ago. In June 2009, this court was advised in the Wagner case that the AMP should be completed in early 2010. It is now mid-2011, and no AMP has been completed. Plaintiffs offer with their Response/Reply a letter from District Rangers Machado and Sabo dated April 15, 2011, which states that the new timeline for the release of the environmental assessment for the public comment period is estimated in fall or winter of 2011, (Pls. Response/ Reply Ex. A), and plaintiffs' Exhibit B indicates expected implementation of the environmental assessment in May 2012.[10] Regardless of when the revised AMP is completed, conducting a BE as part of the present revision of the AMP more than twenty years after the current and operative AMP provided that a Forest Service objective was to "Continue to survey and develop biological evaluations for sensitive species," and which mandated review of "All" Forest Service activities conducted or permitted for the possible effects on sensitive species does not meet the current Forest Plan directives in its goals, objectives, and standards and guidelines. See Or. Natural Desert Ass'n v. Tidwell, 716 F. Supp.2d at 1007-08.

At several points in their briefs, defendants contend that effects of grazing on OSF are uncertain and may be beneficial. The study cited states that OSF habitat would probably improve from moderate grazing "if streambank vegetation was very dense, by creating essential open water areas and allowing very cold water temperatures to increase in a favorable manner," (AR 2709, see

---

[10]    Defendants move to strike certain extra-record evidence offered by plaintiffs, but they do not seek to strike the evidence cited.

AR 3933).  However, defendants do not point to anything in the record to show that this is the condition of the Jack Creek streambank.  Defendants also state that cattle manure is beneficial to the small capsule dung moss found on the Allotment.  (AR 3691.)

However, pointing to possible beneficial effects of livestock grazing and various programs undertaken to protect certain species and habitat does not satisfy the Forest Plan's imperative that all Forest Service activities conducted or permitted "shall be reviewed" for possible effects on sensitive plant and animal species, which is at issue here.  (AR 113.)

The Forest Plan directs that review to assess the possible effects of cattle grazing activity on the sensitive plant and animal species found on the Allotment shall be performed.  The court recognizes that the Forest Service has discretion as to how it complies with Forest Plan direction. ONDA v. Tidwell, 716 F. Supp.2d at 1008 (citing Lands Council v. McNair, 537 F.3d 981, 993-94 (9th Cir. 2008) (en banc), abrogated on another ground by Winter v. Natural Res. Defense Council, Inc., 555 U.S. 7 (2008)).  However, defendants acknowledge that "a BE 'is the means of conducting the review' of possible effects on sensitive species," citing the Manual, see supra.  (Defs. Reply at 13.)  A BE assessing the effects of grazing was conducted in 1995 as part of the 1995 environmental assessment which assessed the effects of continued grazing on the Allotment prior to renewal of the 1996 livestock grazing permit.  (S8 AR 399-434, 437-452.)

The record shows that the Allotment includes unique soils and provides potential and occupied habitat for several sensitive plant and animal species, some of which are unique to the region or to the Allotment, including the Oregon spotted frog.  The sensitive species list for the Allotment was updated in 2008 and extensive surveys have been conducted for sensitive species on the Allotment.  In the circumstances of this case as shown on this record, the court finds that the

35   - ORDER AND REPORT AND RECOMMENDATION

Forest Service was required to review, by some means, and surely by the 2009 or 2010 grazing season, the effects of livestock grazing on the numerous sensitive species of plants and animals found on the Allotment before authorizing virtually the same number of cattle to graze for virtually the same grazing season in 2008, 2009, and 2010.

The court concludes on this record that by failing to review grazing activities occurring annually on the Allotment for the possible effects on sensitive species of animals and plants as mandated in the Forest Plan by at least 2009 before authorizing grazing, defendants made a clear error of judgment rendering their action arbitrary and capricious in violation of NFMA's requirement that the authorizing AOIs be consistent with the Forest Plan. Plaintiffs should be granted summary judgment as to this claim and defendants' motion should be denied.

### NFMA Claim - Round Meadow

Plaintiffs contend that the Forest Service's authorization of grazing on Round Meadow in 2010 was not consistent with Forest Plan directives to protect riparian areas and soils, wildlife and plant populations, and sensitive species. They contend that the Forest Service did not survey all of the meadow to identify sensitive species and habitat and that it performed cursory "reviews" of the effects of grazing rather than meet the standards of BEs set forth in the Manual. As a result, plaintiffs contend that the Forest Service incorrectly stated in the Round Meadow fence decision memo that the fence protected sensitive species and habitat.[11] Defendants contend that the Forest

---

[11]    Defendants object to plaintiffs' contention in their Response/Reply that the grazing on Round Meadow in 2010 was not consistent with Forest Plan direction for species viability for the reason that plaintiffs did not allege this issue as to Round Meadow in their complaint. The court has reviewed plaintiffs' complaint and, to the extent that plaintiffs seek summary judgment on this

Service met the Forest Plan direction to review the potential authorization for possible effects on sensitive species, undertook BEs, and implemented mitigation measures to protect resources.

The record shows that the Forest Service reviewed the proposed activity of grazing up to 80 cow-calf pairs for approximately one month on Round Meadow with a temporary electric fence constructed to exclude spring heads and certain fen habitats. It appears that, although District Ranger Machado contemplated that BEs would be completed, (AR 4730, 4731, 4766), and some Forest Service staff recommended that BEs be prepared, (AR 4710), the decision to allow grazing on Round Meadow in September 2010 was informed by "specialist information" in the form of reports from fisheries, hydrology, wildlife, soils, and botany, (AR 4831-4834, 4835-4837, 4838-4840, 4862-4863, 4894-4896, 4897). The hydrologist, fisheries biologist, and soil scientist each assessed the effects of the proposed grazing, and the wildlife biologist and botanist assessed the effect on sensitive species and habitat inside and outside the temporary fence on Round Meadow.

As to possible effects of grazing on sensitive animal and plant species, the Forest Plan requires that all Forest Service activities conducted or permitted "shall be reviewed." (S8 AR 113.) The court has found that the Forest Service may conduct its review of the possible effects of cattle grazing by any reasonable means or method it chooses, see supra. See Lands Council, 537 F.3d at 992; League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 549 F.3d 1211, 1218 (9th Cir. 2008).

On this record, the court concludes that the Forest Service's decision to allow limited grazing on Round Meadow in September 2010 was not inconsistent with the Forest Plan review provisions

---

ground, it will not be considered by the court.

and defendants did not violate NFMA in this regard.  The decision by the Forest Service was not

arbitrary and capricious.  Plaintiffs' motion for summary judgment as to this claim should be denied

and defendants' motion for summary judgment should be granted.


### NEPA Claims

NEPA "is a procedural statute that requires the Federal agencies to assess the environmental

consequences of their actions before those actions are undertaken." Klamath-Siskiyou Wildlands

Ctr. v. BLM, 387 F.3d 989, 993 (9th Cir. 2004).  Under NEPA, a federal agency must prepare an

environmental impact statement (EIS) or environmental assessment (EA) for all major federal

actions significantly affecting the environment. 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1508.9.  An

agency must take a "hard look" at the environmental consequences of its proposed actions.  Marsh

v. Or. Natural Res. Council, 490 U.S. 360, 374 (1989).  In its EA and/or EIS, the agency must

consider reasonable  alternatives to the proposed course of action for use of available resources.  42

U.S.C. § 4332(E); Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior, 608 F.3d 592,

601-02 (9th Cir. 2010).

The duty to prepare an environmental assessment is a continuing one and "'When new

information comes to light the agency must consider it, evaluate it, and make a reasoned

determination whether it is of such significance'" as to require a supplemental EA (SEA) or EIS

(SEIS). Friends of the Clearwater v. Dombeck, 222 F.3d 552, 558 (9th Cir. 2000) (quoting Warm

Springs Dam Task Force v. Gribble, 621 F.2d 1017, 1023, 1024 (9th Cir. 1980)); 40 C.F.R. §

1502.9(c)(1)(ii); Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1152 (9th Cir. 1998) (EA must

be supplemented in the same manner as an EIS), overruled on other grounds by Lands Council v.

McNair, 537 F.3d 981 (9ᵗʰ Cir. 2008). An SEA or SEIS must be prepared "if there remains major federal action to occur and the new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered." Or. Natural Res. Council Action v. U.S. Forest Serv., 445 F. Supp.2d 1211, 1219 (D. Or. 2006) (citing Marsh, 490 U.S. at 374).

Because one of the goals of NEPA is to ensure the agency will have available and will carefully consider detailed information concerning significant environmental impacts when it makes a decision, Inland Empire Public Lands v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir.1996), the timing of an environmental review is critical, Dombeck, 222 F.3d at 558-59. NEPA's other goal is that, after an agency considers information concerning significant environmental impacts, it makes that information available to the public. 40 C.F.R. § 1500.1(b); Inland Empire, 88 F.3d at 758.

### NEPA Claim - Allotment

Plaintiffs contend that the designation of new sensitive species on the Allotment where cattle grazing occurs and the documentation of damage from grazing on the species and their habitats is new information which is sufficiently significant so as to warrant supplemental environmental analysis. Plaintiffs further contend that, although the Forest Service has indicated that it is in the process of preparing a revised AMP and accompanying EA, it is unknown when the EA and AMP will be completed, and the Forest Service may not make irreversible or irretrievable commitments of resources pending the NEPA analysis which would cause environmental harm or limit the choice of reasonable alternatives available to it. Defendants do not dispute that an SEA is required in the circumstances, but argues that, under Public Law 108-108, Congress has determined that grazing must be permitted to continue under the terms and conditions of existing permits until the Forest

Service completes its AMP analyses and supplemental NEPA analysis would be pointless. Defendants contend that they have discretion under the permit "to alter grazing practices, if it believes this is necessary for resource values or other reasons," (Defs. Reply at 25 (citing AR 2705-2706)), but defendants do not directly address plaintiffs' argument that, under Ninth Circuit law, the Forest Service may not commit its resources irreversibly pending NEPA analysis.

Section 325 of Public Law 108-108 provides in pertinent part that a grazing permit which expires during 2004-2008 "shall be renewed" and the terms and conditions contained in the expired permit "shall continue in effect under the renewed permit" until the Forest Service "completes processing of such permit . . . in compliance with all applicable laws and regulations." (See AR 1690.)

The court does not agree that Public Law 108-108 or the case law relied upon by defendants in arguing that plaintiffs' NEPA claim fails applies in the circumstances of this case. The language of Public Law 108-108 appears to be limited to the NEPA processing as it relates to renewal of a grazing permit. In making their argument that grazing must be continued under the terms and conditions of existing permits until its AMP analyses are complete, defendants rely on Judge Haggerty's decision in Oregon Natural Desert Association v. U.S. Forest Service, No. Civ. 03-381-HA, 2005 WL 1459328 (D. Or. June 20, 2005), rev'd on another ground, 202 F. App'x 244 (9th Cir. 2006) (ONDA II), in which a renewed grazing permit and Public Law 108-108 were at issue. This court finds Judge Haggerty's case distinguishable. There, the court was considering a challenge based, in part, on the Forest Service's alleged "failure to develop current AMPs while nevertheless continuing to issue AOIs." Id. at *2. Judge Haggerty in ONDA II relied on the reasoning reached by Judge Jones in "ONDA I," Oregon Natural Desert Association v. U.S. Forest Service, No. Civ. 03-

40  - ORDER AND REPORT AND RECOMMENDATION

213-JO, who also considered the timeliness of NEPA analysis of "'otherwise invalid grazing permits.'" Judge Jones held that,

> "Legal consequences remain for violations of a grazing permit's standards but not on the basis of a failure to update a NEPA analysis. . . . The NEPA requirement for re-issuing a grazing permit has been held in abeyance by Congress with instruction to federal agencies to work on reducing the backlog of NEPA analyses."

ONDA II, 2005 WL 1459328, at *10 (quoting ONDA I, 03-213-JO, June 3, 2005, Opinion and Order at 26). Judge Haggerty agreed with this reasoning and held that, "Congress has expressly tolled NEPA requirements as they pertain to managing grazing allotments such as those at issue here, " and plaintiffs' "NEPA/delayed analysis claims are foreclosed." ONDA II, 2005 WL 1459328, at *10.

Here, plaintiffs do not make a specific claim based on the delay by the Forest Service in completing its revised AMP and/or EA. While plaintiffs refer to the Forest Service's delay in completing its AMP and EA in their briefs in support of summary judgment, the references are in the context of plaintiffs' contention that the Forest Service may not commit its resources pending new NEPA analysis, as defendants have advised the court the Forest Service is in the process of completing.

Defendants make no other argument in defense of plaintiffs' NEPA claim.

The Ninth Circuit has determined that environmental analysis "must be prepared before any irreversible and irretrievable commitment of resources." Conner v. Burford, 848 F.2d 1441, 1446 (9th Cir. 1988); Metcalf v. Daley, 214 F.3d 1135, 1143 (9th Cir. 2000); W. Watersheds Project v. BLM, Civ. No. 09-0507-E-BLW, 2009 WL 3335365, at *6 (D. Idaho Oct. 14, 2009) ("NEPA and its regulations prohibit agencies from making any irreversible or irretrievable commitment of resources

before an EIS is completed so that the agency does not do damage before even considering the effects of its action.").

Here, plaintiffs have shown in the record documentation of new sensitive species on the Allotment and damage to species habitat from cattle grazing on the Allotment. Defendants do not dispute plaintiffs' claim that an SEA should be prepared in the circumstances. Plaintiffs have shown that allowing grazing each season in the same numbers for virtually the same season is causing harm to sensitive plant and animal species and their habitat which could be irreversible, thereby nullifying any alternatives which might be determined in the pending revised AMP aimed at protecting these plants, animals, and resources. See W. Watersheds Project v. BLM, 2009 WL 3335365, at *6 (finding irreversible damage possible pending SEIS if domestic sheep were allowed to graze on allotment near herd of bighorn sheep; temporary restraining order granted enjoining grazing on allotment).

The court concludes on this record that defendants acted arbitrarily and capriciously in violation of NEPA when they failed to undertake supplemental environmental analysis in light of the sensitive species found on the Allotment before authorizing grazing on the Allotment and committing its resources irreversibly pending completion of the revised AMP. Plaintiffs' motion for summary judgment as to this claim should be granted and defendants' motion should be denied.

### NEPA Claim - Round Meadow

Plaintiffs contend that the Forest Service made the decision and amended the AOI in 2010 to authorize grazing on Round Meadow for the first time in seven years without conducting any site-specific analysis to assess the impacts of grazing on the sensitive resources in the meadow or the

restoration efforts taking place in the meadow. Plaintiffs contend that Round Meadow has never been included in any site-specific NEPA analysis and the decision to graze after non-use should have been open to public scrutiny. Defendants contend that Round Meadow has been available for grazing since its entry into the Allotment for the reason that grazing capacity was not increased for the Allotment and that the Meadow was grazed as recently as 2002. They contend that the 2003 restoration project never contemplated excluding cattle grazing from Round Meadow in contrast to other fencing decisions. Defendants contend that allowing less than one month of grazing in a portion of Round Meadow is not a change to the permit's terms and conditions and does not require formal NEPA analysis. Defendants also contend that the Forest Service reviewed the status of the restoration effort and the impacts of limited grazing in Round Meadow before deciding to allow the grazing.

The record appears to support defendants' contentions that Round Meadow was available for grazing upon its entry into the Allotment through the land exchange and was, in fact, used for cattle grazing prior to the Round Meadow restoration project approved in 2003. Allowing grazing on Round Meadow did not alter the terms and conditions of the grazing permit. The record also supports defendants' contentions that the Forest Service reviewed the status of the restoration effort and reviewed the impacts of limited grazing in Round Meadow by way of staff reviews and assessments before it authorized grazing in Round Meadow in 2010. However, none of this assists defendants in arguing that no NEPA analysis/process was needed.

Whether cattle were "controlled" or "excluded" by the fence constructed for the meadow restoration, there had been no grazing on Round Meadow for approximately seven years while it

underwent rehabilitation and recovery efforts. There has been no NEPA analysis with regard to cattle grazing on Round Meadow due to the fact that Round Meadow entered the Allotment in 1998 after the 1995 EA and BE assessing the effects of continued grazing on the Allotment. No NEPA analysis occurred in 2006 when the grazing permit was renewed due to provisions of Public Law 108-108, see supra. The record shows that sensitive mollusk species and sensitive moss species had been found on Round Meadow as a result of surveys conducted during the restoration. In light of this history, when the permittee requested to be allowed to graze Round Meadow, such proposed grazing was a proposed action with environmental impacts triggering NEPA analysis. It is noteworthy that defendants recognized the necessity of NEPA analysis for installation of the temporary fence on Round Meadow[12] but not for the cattle grazing which also would be taking place on Round Meadow. To the extent that defendants rely on Public Law 108-108 to contend that a NEPA analysis was not required, the court has concluded that Public Law 108-108 does not apply in the circumstances.

The court concludes on this record that defendants acted arbitrarily and capriciously by failing to subject their decision to graze cattle on Round Meadow in 2010 to NEPA analysis and process. Plaintiffs should be granted summary judgment as to this claim and defendants' motion should be denied.

//

---

[12] In the scoping letters sent out regarding the proposed fence and in his decision memo approving installation of the temporary fence on Round Meadow, District Ranger Sabo found that his decision was categorically excluded from documentation in an EA or EIS. (AR 4899-4900; see e.g., AR 4796.)

## ORDER

The court has not considered the extra-record evidence offered by plaintiffs which defendants move to strike in their motion and in their reply brief. Accordingly, defendants' motions to strike are denied as moot.

## RECOMMENDATION

Based on the foregoing, it is recommended that plaintiffs' motion for summary judgment (#18) be granted in part and denied in part, and that defendants' motion for summary judgment (#27) be granted in part and denied in part, and that judgment be entered accordingly.

By separate order, the court will set a status conference to discuss further handling of the case.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. *Objections to this Report and Recommendation, if any, are due by August 1, 2011. If objections are filed, any response to the objections are due by August 18, 2011, see* Federal Rules of Civil Procedure 72 and 6.

Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

//

DATED this _____ day of July, 2011.

_____
UNITED STATES MAGISTRATE JUDGE