IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

| | |
|---|---|
| OREGON NATURAL DESERT ASSOCIATION; and KLAMATH SISKIYOU WILDLANDS CENTER,<br><br>   Plaintiffs,<br><br> v.<br><br>DAVID SABO, District Ranger, Chemult Ranger District, Fremont-Winema National Forests; and U. S. FOREST SERVICE,<br><br>   Defendants,<br><br> and<br><br>IVERSON MANAGEMENT LIMITED PARTNERSHIP,<br><br>   Intervenors. | Civil No. 10-1212-CL<br><br>ORDER AND AMENDED REPORT AND RECOMMENDATION REGARDING REMEDIAL RELIEF |

CLARKE, Magistrate Judge.

On July 12, 2011, this Court entered an Order and Report and Recommendation recommending that plaintiffs' motions for summary judgment as to their NFMA claims regarding the Allotment be granted and that their NEPA claims as to the Allotment and as to Round Meadow be

1 - REPORT AND RECOMMENDATION

granted (#37). Plaintiffs have filed a motion to amend Order and Report and Recommendation to add remedial relief (#43). Iverson Management Limited Partnership (Iverson LP) then sought to intervene in the case, which the Court allowed (#50). Plaintiffs have also filed a notice of supplemental evidence (#61), which defendants and defendant-intervenor object to and defendant-intervenor move to strike (#63). The Court heard oral argument on these issues on August 25, 2011. For the reasons that follow, plaintiffs' motion to add remedial relief should be denied; the Court amends its July 12 Order and Report and Recommendation to explain its ruling.

## DISCUSSION

### Defendants' Request to Correct July 12, 2011, Order and Report and Recommendation

As an initial matter, the Court addresses defendants' requests in their response to correct the Court's Order and Report and Recommendation (R&R).

The Court's July 12, 2011, R&R is corrected as follows:

on page 34, in the third line of the first paragraph, "1990" and "twenty" should be deleted and "1995" and "fifteen" should be substituted; the full sentence should read: "The current AMP was completed in 1995, over fifteen years ago."

The Court declines to correct the R&R as it relates to the finding that the 2008 AOI was arbitrary and capricious. Making the change requested by defendants does not change the Court's legal analysis.

//

//

## Defendants' and Defendant-Intervenor's Objections to Plaintiffs' Supplemental Evidence and Defendant-Intervenor's Motion to Strike

After defendants and defendant-intervenor filed their responses to plaintiffs' motion, plaintiffs filed certain supplemental evidence in the form of some August 2011 emails and letters addressed to defendant Sabo and Barbara Machado by Jayne Goodwin and some photographs allegedly taken by Ms. Goodwin. The Court sustains defendants' and defendant-intervenor's objections to this evidence and plaintiffs' supplemental evidence will not be considered by the Court. Defendant-intervenor's motion to strike is granted.

## Plaintiffs' Motion to Amend R&R to Add Remedial Relief

### Relevant Procedural History and Relief Sought

In March 2011, the permitee, Iverson LP, requested to be allowed to graze exclosures presently in the Allotment, including the Round Meadow exclosure. District Ranger Sabo decided to consider effects analysis and draft BEs for sensitive plant, animal, and aquatic species from Forest Service specialists in wildlife, botany, soils, range, and watershed/fisheries before making his decision on the request. (#59 Sabo Decl.)

The 2011 AOI was issued on May 6, 2011, without a decision made as to the permitee's request to graze any of the exclosures. The AOI authorizes grazing for the Allotment on the Silver Lake and Chemult Ranger Districts.[1] The AOI authorized 275 cow-calf pairs and 104 cow/calf pairs

---

[1] See the July 12, 2011, R&R note 7.

3 - REPORT AND RECOMMENDATION

private on the Chemult Pasture, a total of 379 cow/calf pairs, beginning August 1, and moved from the pasture beginning September 15, with 90% off Forest by September 30. The AOI states:

> The Jack Creek Riparian Pasture on the Chemult Pasture is still in a "no grazing" status until completion of a new Allotment Management Plan. It is your responsibility to maintain the Jack Creek Riparian fence in a manner that keeps cattle from accessing the riparian pasture and to monitor the area regularly to minimize/eliminate livestock impacts in this area. Cattle observed in the Jack Creek Riparian Pasture will be reported to you in a timely manner and it is my expectation that you will respond quickly to these reports. Any livestock in the Jack Creek Riparian Pasture will be moved out as soon as possible but no longer than 3 days of you receiving the report. If livestock accessing the Jack Creek Riparian Pasture becomes a chronic problem over the summer or you do not respond in a timely manner, I will consider permit action to rectify the situation.

In the "Herding" section, it is stated that, "Keep cattle moving and away from riparian zones as often as possible." The "Maintenance Responsibilities" section states: "Maintenance of structures needed to control livestock is an issue within the Antelope/Chemult allotment. We are assessing the condition of all structures on the allotment in preparation for a new Allotment Management Plan. Please keep notes of structures that no longer function or cannot be maintained for inclusion in the new AMP." (Defs. Response Ex. A.)

After receiving the analysis and draft BEs in early May 2011, and discussion with the specialists, District Ranger Sabo decided not to authorize grazing on the existing exclosures, but he would consider grazing within the Round Meadow exclosure. (#59 Sabo Decl.)

At the May 24, 2011, oral argument on the parties' cross-motions for summary judgment, defendants made known that the 2011 AOI had been issued in May, authorizing grazing to begin on August 1.

The Court issued its R&R on July 12, 2011.

As a result of the Court's R&R and discussion with the permitee's representative, Keith Little, District Ranger Sabo decided not to proceed with further consideration of grazing in Round Meadow in the 2011 season. (#59 Sabo Decl.)

The Forest Service completed three BEs for sensitive plant, animal, and aquatic species prior to the August 1 grazing season: an Aquatic Species BE dated July 29, 2011; a Terrestrial Wildlife BE dated July 29, 2011; and a Botanical Species and Terrestrial Mollusks BE and Special Report dated July 30, 2011. (#59 Sabo Decl. Ex. B; Markus Decl. Ex. A; Malaby Decl. Ex. A.)

In their motion to add remedial relief filed on July 28, 2011, plaintiffs seek to add the following relief relating to the Allotment:

- prohibition of grazing in Round Meadow and all exclosures until completion of NEPA analysis
- exclusion of cattle from sensitive species habitat until completion of biological evaluations for sensitive species and NEPA analysis; sensitive species habitat needing protection to be identified by the Chemult District wildlife biologist and zone botanist, minimally to include all known sensitive species sites, and requiring
  - installation of temporary electric fencing around ten habitat sites identified in the motion
  - permitee to have riders with the cattle at all times, actively herding cattle away from identified sensitive species habitat, including all exclosures and temporary fenced areas

5 - REPORT AND RECOMMENDATION

- weekly monitoring during grazing season for presence of cattle in identified sensitive species habitat, with removal of cattle if repeated trespass occurs; biweekly reports to plaintiffs and mid-season report to the Court
- completion of biological evaluations for all sensitive species and NEPA analysis by March 30, 2013; completion of Oregon spotted frog site management plan by December 31, 2011, and all scoped frog habitat restoration projects by November 30, 2012; completion of a site management plan for plant and mollusk sensitive species and restoration of fen habitat by August 31, 2012

(Pls. Brief at 13-15 & Pls. "[Proposed] Amended Order and Report and Recommendation.")

Plaintiffs did not move to amend their complaint to challenge the 2011 AOI. Plaintiffs did not move for any type of injunctive relief at any stage of the proceeding until they filed the instant motion. In their complaint, plaintiff's did not include any claim for delay in completing the revised AMP. (See R&R at 41.)

## Analysis

Plaintiffs move to amend the Court's R&R to add remedial relief, contending that the relief is necessary to remedy the multiple legal violations of NFMA and NEPA which the Court found in its July 12 decision, and to remedy past harms and prevent future irreparable harms to unique fen communities and sensitive plant and animal species found on the Allotment. In moving to amend, plaintiffs rely upon Federal Rules of Civil Procedure 60(b), 72(b), and 65, and the Court's R&R.

The rules cited by plaintiff are not really on point. As pointed out by defendants, Rule 60(b) relates to grounds for relief from a final judgment, order, or proceeding, and Rule 65 relates to issuing preliminary injunctions and temporary restraining orders. Rule 72(b) relates to magistrate

6 - REPORT AND RECOMMENDATION

judges and dispositive motions. However, the court has broad authority to fashion an equitable remedy. United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 175 (9th Cir. 1987) ("The essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case.")

**Injunctive Relief**

Before a court may issue permanent injunctive relief,[2] a plaintiff must meet the well-established four-factor test:

> (1) that it has suffered an irreparable injury: (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Sierra Forest Legacy v. Sherman, 646 F.3d 1161, 1184 (9th Cir. 2011) (per curiam) (Sherman) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)); Monsanto Co. v. Geertson Seed Farms, ___ U.S. ___, 130 S. Ct. 2743, 2756-57 (2010) (applying four-factor test in NEPA violation case). "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 32 (2008) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)). Injunctive relief is "an

---

[2] While the Court considers whether permanent injunctive relief should be issued since the request for injunctive relief comes after a recommended disposition of the case, it seems clear from plaintiffs' proposed injunction and the parties' arguments at the hearing that the relief sought essentially is for the 2011 and 2012 grazing seasons until defendant Forest Service completes its NEPA analysis for the revised AMP. The standards for issuing a preliminary injunction are the same as those for a permanent injunction, so whether the Court considers the relief sought by plaintiffs to be permanent or preliminary, its ruling is the same.

7 - REPORT AND RECOMMENDATION

extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22, 24. No "thumb on the scales is warranted" in an environmental case. See Monsanto, ___ U.S. ___, 130 S. Ct. at 2757 (NEPA case). As the cited cases make clear, it is plaintiff's burden to prove that the requested injunctive relief is warranted. See Natural Res. Def. Council, Inc. v. Winter, 508 F.3d 885, 886 (9th Cir. 2007). Any injunctive relief ordered must be tailored to remedy the specific harm alleged. Stormans, Inc. v. Selecky, 586 F.3d 1109, 1140 (9th Cir. 2009).

The Supreme Court has stated that, "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987); Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). There appears to be no dispute that the element of inadequate remedies at law is met in this case. See Amoco Prod., 480 U.S. at 545. However, while environmental harm is often irreparable, the court may not presume irreparable harm upon a showing of likelihood of success on the merits or a finding of a NEPA or NFMA violation. See Flexible Lifeline Sys. v. Precision Lift, Inc., ___ F.3d ___, No. 10-35987, 2011 WL 3659315, at *5-*10 (9th Cir. Aug. 22, 2011) (and cases cited).

In support of this element, plaintiffs point to statements in the factual background of the Court's July 12 R&R and to portions of the administrative record. The Court found in the R&R that plaintiffs had shown harm to plant and animal sensitive species and their habitat on the Allotment. The most the Court found in its R&R was that, in relation to plaintiffs' NEPA claim as to the Allotment, "allowing grazing each season in the same numbers for virtually the same season is

8 - REPORT AND RECOMMENDATION

causing harm to sensitive plant and animal species and their habitat, which could be irreversible." (R&R at 42.) As the July 12 R&R shows, there is no question that injury has occurred to fens, mollusks, Oregon spotted frogs, and habitat due to cattle grazing. But these findings of harm do not equate to a finding of existing irreparable harm, or that irreparable injury will likely occur if grazing is allowed under the conditions of the 2011 AOI.

Other than bold assertions, plaintiffs have not offered any expert declarations in support of a showing of irreparable harm to any of the plant or animal sensitive species or their habitats. As stated previously, irreparable harm is no longer presumed when an environmental violation is found. Plaintiffs refer in their motion to the Goodwin declaration filed with the motion for summary judgment, but defendants offer evidence that that declaration was offered for the purpose of establishing standing only and not as an expert opinion going to the merits of the case. (Defs. Resp. Ex. B.)

At oral argument, plaintiffs argued that defendants' evidence that some fen locations were in poor condition showed irreparable injury. (See Malaby Decl. Ex. A.) However, there was no showing that the poor fen condition[3] was due to cattle grazing rather than due to naturally occurring bare soil or that any soil disturbance was due to damage by other ungulate wildlife.

Here, defendant Forest Service completed draft sensitive plant, animal, and aquatic species BEs prior to issuance of the 2011 AOI in May, and completed the BEs by the end of July prior to the August 1 beginning of grazing season. (#59 Sabo Decl. & Ex. B July 29, 2011, Aquatic Species BE; Markus Decl. & Ex. A July 29, 2011, Terrestrial Wildlife BE; Malaby Decl. & Ex. A July 30, 2011, Botanical Species and Terrestrial Mollusks BE and Special Report.) The Forest Wildlife Biologist,

---

[3] "Poor condition" is defined in Ms. Malaby's BE as 20% or more soil disturbance, and "soil disturbance" is defined as bare soil, hummocking, and/or postholing. (Malaby Decl. Ex. A at 7.)

9 - REPORT AND RECOMMENDATION

Ms. Markus, evaluated all terrestrial wildlife on the sensitive species list for the region including the Oregon spotted frog, with the exception of terrestrial mollusks. Her impact determination (direct, indirect, and cumulative impacts) of the effects of grazing in 2011 on the Allotment, as to the Oregon spotted frog, was "'may impact individuals or habitat, but would not likely contribute to a trend towards federal listing, or cause loss of viability to the population or species.'" (Markus Decl. ¶ 2 & Ex. A at 47.) Her impact determination as to other region sensitive species was the same or a determination of "'no impact." Ms. Malaby, the Forest Botanist, addressed all botanical species and terrestrial mollusks in her BE. As to species with known habitat in the Chemult Pasture, her impact determination was "'may impact individuals or habitat, but would not likely contribute to a trend towards federal listing, or cause loss of viability to the population or species.'" Her impact determination as to other region sensitive species was the same or a determination of "'no impact." (Malaby Decl. ¶¶ 3-4 & Ex. A.)

Plaintiffs appear to argue that the Court should not defer to government experts when violations have been found, citing Sherman. The Ninth Circuit in that case determined that the district court abused its discretion when it deferred to agency views "concerning the equitable prerequisites for an injunction." 646 F.3d at 1185-86. The Sherman court stated that, "[e]cology is not a field within the unique expertise of the federal government." Id.

Here, the Court does not consider any reliance on the declarations offered by the Forest Service as deferring to these declarations simply because they are offered by the government. Plaintiffs have not offered any contrary declarations in support of their motion nor do they point to other evidence which supports a finding of irreparable injury.

Plaintiffs assert in their brief that, "This year it is particularly important to protect the fens because of the late snowpack, which prolongs the standing water and high soil moisture in the fens,

10 - REPORT AND RECOMMENDATION

making them more susceptible to damage from cattle hooves. (Pls. Brief at 10.) Plaintiffs offer no evidence in support of their argument that the late snowpack makes the fens more susceptible to damage. Defendants argue, in contrast, that a wet year with abundant sedge and grass growth should retain the good condition of fens and sensitive plant habitat, offering the Malaby Declaration in support.

As part of the remedial relief sought, plaintiffs propose, in part, to install temporary fencing around ten habitat sites on the Allotment. They also seek to require that the permitee have riders with cattle "at all times" cattle are on the Allotment. (#43-8 Pls. "[Proposed] Amended Order and Report and Recommendation.")

The relief sought by plaintiffs is not practical, would take a long time to accomplish, and would be very expensive. It would also have serious impact on the intervenor's business.

District Ranger Sabo states in his August 15 declaration that the ten sites identified by plaintiff range in size from approximately five acres to fifty-nine acres, which would require "several miles" of fencing to enclose the areas, in ten different configurations and ten electric charge options. He states that to secure funding for personnel and materials, as well as clearing forested areas for the fencing is a "staggering" proposal, and it is unlikely that the work could be completed this grazing season. Southwest Zone Rangeland Manager for the Forest, Joseph E. Robson, declares that most of the ten areas require fencing through lodgepole pine forest including standing and down timber, which would require clearing an adequate right of way to ensure effective fencing. Mr. Robson further states that the forest has four chargers of adequate capacity and two solar panels and other materials, but additional materials would have to be purchased. (#60 Robson Decl.) District Ranger Sabo further states in his declaration that fencing the ten locations is not feasible because of NEPA

11 - REPORT AND RECOMMENDATION

requirements for installation of electric fences which could not be completed this grazing season. (#59 Sabo Decl.) Keith Little, ranch manager for intervenor Iverson LP states in his August 4 declaration that fencing the ten areas proposed would be practically and economically infeasible. He states that if the partnership were required to pay for the fencing, grazing on the Chemult Pasture would become unprofitable and it would likely choose to fence its private lands and graze all its cows on private pasture land. (#48 Little Decl.)

The Court notes that, in support of the requested relief, plaintiffs state that the relief would alleviate harm by restoring and protecting important and unique fen habitat as well as spotted frog habitat but still allow grazing of the "uplands" in the Allotment. (Pls. Brief at 10, 18.) No declaration is offered in support of this assertion. However, it is noteworthy that the Botanical Species and Terrestrial Mollusks BE states in the section discussing direct, indirect, and cumulative effects to sensitive plants with potential habitat in the Chemult Pasture that, "Grazing is likely to have minimal effects to upland species in the Chemult pasture, because upland habitats lack forage to attract livestock." (Malaby Decl. Ex. A at 15.)

The 2011 AOI requires that Iverson LP provide a herder throughout the grazing season to maintain proper distribution of cattle and to keep cattle moving and away from riparian zones as often as possible. (Defs. Resp. Ex. A.) Mr. Little states in his declaration that he normally checks the fences and rides the Allotment four to five days per week during the season to ensure that cattle are well distributed and "not impacting sensitive rangeland, riparian and wetland resources." He states that, as an added level of protection, he plans to increase his riding to five to six days per week for the remainder of this season. Mr. Little estimates that, to meet the riding requirement proposed by plaintiffs, he would have to hire five full-time riders to monitor the ten areas proposed to be

fenced, which is a significant financial strain and practically impossible to accomplish on short notice. (#48 Little Decl.)

District Ranger Sabo decided not to allow grazing in any of the existing exclosures, including Round Meadow this season. Mr. Little, intervenor Iverson LP's manager, declares that he intends to increase his riding of the Allotment to check fences and ensure that cattle are well distributed and not affecting sensitive Allotment resources. Even with these measures, if plaintiffs are not granted the relief they request, there will undoubtedly be impacts to sensitive species and habitat from cattle grazing this season. However, based upon the record and the opinions of the Forest wildlife biologist and Forest botanist, these impacts will be isolated. Balancing the hardships on each side favors defendants and the intervenor.

Finally, the public interest is not all that clear. It is true, as plaintiffs assert, that, "[t]he preservation of our environment, as required by NEPA and NFMA, is clearly in the public interest." Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1177 (9th Cir. 2006), abrogated on other grounds by Winter, 555 U.S. 7. However, if the Court grants the relief requested by plaintiffs, in particular the fencing of the ten identified habitat sites, the permitee-intervenor may well move all the cattle to private land where valuable frog habitat is located. The intervenor's manager, Mr. Little, states in his declaration that the partnership's private lands include "prime" and " key" Oregon spotted frog habitat. (See Markus Decl. Ex. A at 28.[4]) Mr. Little states that, in the last three years, Iverson LP has worked with U.S. Fish and Wildlife Service to improve the habitat on its private lands for the benefit of the spotted frogs, but if the partnership is forced to graze its private lands

---

[4] Privately owned Upper Jamison, 52 acres, "is one of two remaining areas along Jack Creek that currently provide extremely valuable habitat for OSF," with extensive breeding/tadpole habitat, and may provide overwintering habitat.

13 - REPORT AND RECOMMENDATION

more intensively, he believes that "it is inevitable that this circumstance would put the quality of the spotted frog habitat located on our lands at some risk." (#48 Little Decl.)

The Court recognizes the public interest in preserving the unique environmental resources on the Allotment. However, based on this record, granting the relief requested would very likely result in serious damage to prime habitat for the Oregon spotted frog on the permitee intervenor's private lands and would have serious impact on the intervenor's business.

## Conclusion

Plaintiffs make no showing to demonstrate that the relief requested is warranted in the circumstances and the relief they seek is too impractical. The record shows that defendants responded appropriately by completing sensitive species BEs prior to issuing operating instructions for the Allotment for the grazing season and by cutting the grazing season by one month.

The Court remains concerned about the unique environmental resources on the Allotment. The Court expects the defendants to complete the NEPA and AMP processes on the Allotment in a timely manner, and with serious consideration of the views of plaintiffs and other concerned groups and citizens.

In conclusion, the Court finds that plaintiffs have not sustained their burden of establishing the elements of the four-factor test to show that they are entitled to the injunctive relief sought. Accordingly, plaintiffs' motion to add remedial relief to the Court's R&R should be denied.

## ORDER

The Court's Order and Report and Recommendation filed July 12, 2011 (#37) is corrected as stated herein.

Defendants' and defendant-intervenor's objections to plaintiff's supplemental evidence are sustained and defendant-intervenor's motion to strike is granted.

### RECOMMENDATION

Based on the foregoing, it is recommended that plaintiffs' motion to amend Order and Report and Recommendation to add remedial relief (#43) be denied as to the remedial relief plaintiffs seek.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. **Objections to this Report and Recommendation, if any, and to the Court's July 12, 2011, Report and Recommendation, if any, are due by October 14, 2011. If objections are filed, any response to the objections are due by October 31, 2011,** see Federal Rules of Civil Procedure 72 and 6.

Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this 26 day of September, 2011.

MARK D. CLARKE
UNITED STATES MAGISTRATE JUDGE

15 - REPORT AND RECOMMENDATION